UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

MARY WILSON BURKE, On Behalf of
Herself and All Others Similarly Situated,

                     Plaintiff,

    vs.

CHINA AVIATION OIL (SINGAPORE)
CORPORATION LTD., JIA CHANGBIN and
CHEN JIULIN,

                 Defendants.

_____ x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 05CV00060 (RPP)

"ECF CASE"

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

DEMAND FOR JURY TRIAL

**SUMMARY**

1.      This is a securities class action on behalf of all purchasers of the publicly traded securities of China Aviation Oil (Singapore) Corporation Ltd. ("China Aviation" or the "Company") between February 5, 2004 and November 30, 2004 (the "Class Period"), against China Aviation, which trades in petroleum products, including jet fuel, gas oil, fuel oil, crude oil, plastics and oil derivatives, and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      During the Class Period, defendants issued false and misleading statements regarding the Company's business and prospects.  As a result of the defendants' false statements, China Aviation shares traded at inflated levels during the Class Period, whereby the Company's top officers and directors assisted the Company's parent company/controlling shareholder in the sale of $120 million worth of its own shares.

3.      The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

        (a)     that contrary to the Company's prospectus, the Company did ***not*** have the necessary risk management controls in place for hedging and trading;

        (b)     that contrary to the private placement offering documents, the funds raised were not to fund an acquisition of the controlling shareholders but rather to meet margin calls for the massive derivative losses in the Company; and

        (c)     that the Company's financial statements were grossly overstated or the Company was hiding liabilities totaling in excess of $550 million in derivative trading losses, as described in ¶¶53-57.

4.      On November 30, 2004, *Bloomberg* published an article entitled "China Aviation Seeks Court Protection After $550 Mln Oil Loss," which stated in part:

> China Aviation Oil (Singapore) Corp., supplier of a third of China's jet fuel, will ask Singapore's High Court for protection from creditors after losing about $550 million from bad bets on oil prices.

5.      Also on November 30, 2004, *Bloomberg* published an article entitled "Singapore Shareholder Group 'Shocked' by China Aviation Loss," which stated in part:

> The Securities Investors Association Singapore, a group representing retail investors in the city-state, said it's "shocked" by China Aviation Oil (Singapore) Corp.'s $550 million loss from bad debts on the price of oil.

> "To the shareholders, it's a corporate earthquake, ..." David Gerald, president of the group, said in an interview.  "Is this another Barings?  They're asking."

6.      On December 2, 2004, *Bloomberg* published an article entitled "China Aviation Stake Was Sold to Cover Margin Calls, CEO Says," which stated in part:

> China Aviation Oil Holding Co. brought forward the sale of a 15 percent stake in its Singapore subsidiary to cover margin calls, or funding requirements, on derivatives contracts that triggered $550 million of losses, according to a court filing.

> The Oct. 20 sale of a S$196 million ($119 million) stake in China Aviation Oil (Singapore) Corp., which this week sought protection from creditors, ***came 10 days after the unit told its parent of "potential losses" on derivative transactions, according to an affidavit filed in Singapore's High Court by the unit's chief executive, Chen Jiulin***.

> The affidavit was dated Nov. 29, a day before China Aviation disclosed the derivatives losses, and indicates the Chinese state-owned parent didn't tell stock buyers of the company's financial crisis.  The Singapore exchange is investigating the unit and seeking Chen's return from Beijing.

> "This transaction was conducted entirely in accordance with market practice," said Mike West, a spokesman for sale arranger Deutsche Bank AG.  "The bank is cooperating with regulators in Singapore."

> A loan of $100 million from the parent company wasn't enough to cover the unit's margins calls, the subsidiary said in a statement to the Singapore stock exchange on Nov. 30.

> The parent "had an investment they are making and they need to raise the cash," John Casey, a spokesman for the Singapore unit, said in a telephone interview on Oct. 21, declining to comment further on the parent company's acquisition.  "They wanted to get the deal completed as soon as possible."

Share Sale

Deutsche sold the shares at S$1.35 apiece within four hours, it said in a statement on Oct. 21, with three-quarters of investors from Asia and the remainder from Europe.  The stock declined 8.9 percent when trading resumed on Oct. 21 after the sale.  The shares were trading at 96.5 Singapore cents before they were suspended again on Nov. 29, a 29 percent decline from their placement price.

"This transaction is positive for the company as it diversifies is shareholder base," Deutsche said on Oct. 21.  "It also underlines the strength of Deutsche Bank's Equity Capital Markets platform in Asia and our ability to raise capital for Singaporean corporates during difficult market conditions."

7.      On December 3, 2004, *Bloomberg* published an article entitled "China Aviation Doubled Bets to Cover Loss, *WSJ* Says," which stated in part:

China Aviation Oil (Singapore) Corp., the overseas unit of China's main jet-fuel supplier, repeatedly doubled its bet oil prices would fall in an effort to recover mounting losses on derivatives trades, the *Wall Street Journal* reported, citing court documents.

The Singapore-based unit lost $5.8 million in trades in the first quarter and $35.8 million in the second, and decided to "move back positions on the trades in an effort to ride through the upward-trending oil market," Chen Jiulin, CAO's chief executive said in an affidavit submitted to Singapore's High Court Monday.  Jiulin was suspended earlier this week.

## JURISDICTION AND VENUE

8.      Jurisdiction is conferred by § 27 of the 1934 Act.  The claims asserted herein arise under §§ 10(b) and 20(a) of the 1934 Act and Rule 10b-5.

9.      Venue is proper in this District pursuant to § 27 of the 1934 Act.  Each of the defendants prepared the press releases which defendants used to induce U.S. investors to acquire the Company's shares.  The trading of speculative options contracts, which defendants claimed they controlled, served as the catalyst to push the Company into insolvency.  Said trading occurred on and/or had an effect on the exchanges in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

11.     Throughout the Class Period, China Aviation was listed on the Over-The-Counter market (the "OTC") and the Pink Sheets issued quotes on its securities.  The Pink Sheets is a centralized quotation service that collects and publishes market maker quotes for OTC securities in real time.  The OTC and the Pink Sheets are competing quotation services for OTC equity securities. The Pink Sheets are operated by the National Quotation Bureau, LLC (NQB) and are a static paper quotation medium printed weekly and distributed to broker/dealers while the OTCBB displays electronic real-time quotes, last-sale prices, and volume information for domestic securities, foreign securities, and ADRs.

12.     In order for the China Aviation to have been listed on the Pink Sheets, China Aviation needed to find at least one market maker willing to quote the company's stock.  Only SEC-registered broker-dealers (market makers) that are members of the National Association of Securities Dealers (NASD) can quote securities in the Pink Sheets.  Moreover, a broker or dealer would have needed to have filed a Form 211 containing China Aviation's financial information with the NASD OTC, which would than have to approve China Aviation for trading.  Additionally, there would have had to have been at least one market maker willing to quote the company's stock.  SEC Rule 15c2-11.

13.     In addition, China Aviation, in numerous press releases, asserted that it conducted business in the United States.  For example, in a May 19, 2003 press release, entitled "China Aviation Oil's Q1 2003 Results Reflect Effectiveness of Three-Pronged Strategy," China Aviation stated:

> Today, CAO trades globally in fuel oil, gas oil, crude oil, petrochemical products and oil derivatives and handles virtually 100% of China's total jet fuel imports.  Annual sales revenue was S$1.69 billion in 2002 and ***market scope has expanded beyond China to ASEAN, the Far East and USA.***" [Emphasis Added]

14.     China Aviation included references to its growing U.S. business in each of its press releases throughout the Class Period.  Indeed, in a speech entitled "Sharing and Jointly Developing

Markets to Achieve Win-Win Business Outcomes," given by defendant Chen Jiulin in the United States on June 18, 2004, Defendant Jiulin stated that "CAO has extensive cooperative relationship with American firms. ***For instance, we have collaborated with Chevron Texaco to supply jet fuel to the US West Coast, and fuel oil to China***."

15.     Moreover, during the Class Period, China Aviation issued the materially false and misleading financial statements which constitute the core of the case through its website in English. China Aviation's website was transmitted to U.S. investors via the internet into the U.S.

## THE PARTIES

16.     Plaintiff Mary Wilson Burke purchased China Aviation publicly traded securities as described in the attached certification and was damaged thereby. Ms. Burke, a resident of New York, purchased her shares of China Aviation on the Over-The-Counter market under the symbol "CAOLF" in the United States.

17.     Defendant China Aviation trades in petroleum products, including jet fuel, gas oil, fuel oil, crude oil, plastics and oil derivatives.

18.     Defendant Jia Changbin ("Jia") was the Chairman of China Aviation and President of the Company's controlling shareholder, China Aviation Oil Holding Company, which is also referred to as "controlling shareholder."

19.     Defendant Chen Juilin ("Chen") was the Managing Director and CEO of China Aviation.

20.     The individuals named as defendants in ¶¶ 18-19 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of China Aviation's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and

press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶ 43-46, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

21.     In addition to the above-described involvement, each Individual Defendant had knowledge of China Aviation's problems and was motivated to conceal such problems. Jia, as Chairman, and Chen, as Managing Director and CEO, were responsible for financial reporting and communications with the market. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

22.     Defendants were motivated to engage in the fraudulent practices alleged herein in order to obtain financing for the Company and participate in the Chinese/Singapore stock boom and assist the controlling shareholder in selling its shares of the Company onto the unsuspecting public.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

23.     Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose adverse facts known to him about China Aviation. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of China Aviation publicly traded securities was a success, as it (i) deceived the investing public regarding China Aviation's prospects and business; (ii) artificially inflated the prices of China Aviation's publicly traded securities; (iii) allowed defendants to obtain larger bonuses which were directly tied to the performance of China

Aviation; (iv) allowed defendants to arrange to sell and actually sell in excess of $120 million worth of China Aviation shares at artificially inflated prices via a private placement; and (v) caused plaintiff and other members of the Class to purchase China Aviation publicly traded securities at artificially inflated prices.

## BACKGROUND AND OVERVIEW

24.     In May 1993, the Company started in Singapore as a shipping broker.  By 1997, the Company started oil trading operations with a focus on jet fuel procurement.  By 1999, the Company expanded into trading other fuels such as fuel oil, diesel and petrochemical products.

25.     On December 6, 2001, the Company sold S$80.6 million (US$44 million) worth of shares via the Company's IPO.  In March 2002, the Company was rated 26th most transparent among publicly listed companies in Singapore, according to the *Business Times* index.  In August 2002, China Aviation won the most-transparent-company award given by the Securities Investors Association (Singapore), according to China Aviation's Web site.

26.     On April 23, 2003, China Aviation completed transfer of ownership to China Aviation Oil Holding Co. from China Aviation Oil Supply Corporation, which had been the monopoly jet fuel supplier in China.  On July 18, 2003, the Company signed a $160 million five-year syndicated loan with ten banks led by Societe Generale, SA's Asia unit.

27.     On January 20, 2004, China Aviation was acknowledged for its ***"outstanding risk-management structure and procedures"*** by China National Enterprise Federation at its 10th annual creative management awards, according to China Aviation's Web site.

28.     On October 21, 2004, China Aviation's parent sold a 15% stake in the Company to institutional investors.  Deutsche Bank AG's Singapore unit was the book runner for the placement. China Aviation raised S$196 (US$120) million, selling 145.2 million shares at S$1.35 apiece.  That

- 7 -

was a 14% discount to the stock's last-traded price on October 19, 2004, before it was halted from trading.

29.    On December 1, 2004, Chen, who was suspended as chief executive of China Aviation, left for China after filing an affidavit dated November 29, 2004, in Singapore's High Court detailing trading losses.  Singapore Exchange Ltd., which runs the city's securities and derivatives market, said an investigation into China Aviation's losses could take weeks.  The exchange directed China Aviation to appoint PriceWaterhouseCoopers as an auditor to conduct the probe.

## PRE-CLASS PERIOD STATEMENTS

30.    On August 14, 2000, *Bloomberg* published a release, entitled "Singapore Unit of China Aviation Oil Plans Share Sale, BT Says."  The release stated in part:

> China Aviation Oil (Singapore), an oil trading company that controls 99 percent of China's aviation oil imports, may sell shares on the Singapore Exchange early next year, the *Business Times* newspaper reported, citing Chen Jiulin, the company's managing director.
>
> The company is a wholly owned subsidiary of state-owned China Aviation Oil Supply Corp., which supplies more than four million metric tons of jet fuel to over 100 airlines in 139 airports around China annually.

31.    On May 25, 2001, *Bloomberg* issued a press release, entitled "China Aviation Oil's Singapore Unit Plans Share Sale," which stated in part:

> China Aviation Oil (Singapore) Ptd., which controls 99 percent of China's jet fuel imports, said it plans to raise at least $20 million in an initial share sale in Singapore this year.
>
> The company is wholly owned by China Aviation Oil Supply Corp., which supplies jet fuel to foreign and domestic airlines at more than 100 airports in China. **It needs money to open an office in the U.S. and expand in trading.**
>
> **"By the end of this year, or the beginning of new year, we should have some action" on opening a trading office on the U.S. west coast**, said Chen Jiulin, managing director.  (emphasis added.)

- 8 -

32.     On November 11, 2001, *Bloomberg* issued a press release, entitled "China Aviation Oil to Sell $30 Mln Singapore Shares, Paper Says," which stated in part:

> China Aviation Oil (Singapore) Pte., which supplies 98 percent of the jet fuel China imports, plans to raise about $30 million by selling shares in Singapore later this month, Oilchina.com reported, citing Chen Jiulin, its managing director in an Economic Daily report.
>
> ***The company plans to sell a 25 percent stake in the company, the report said.  Proceeds from the share sale will be used to buy trading companies in the U.S.*** and assets in China, the report said, without giving details.
>
> DBS Group Holdings Ltd. will manage the sale, the report said.
>
> China Aviation predicts pretax profit this year may climb about a quarter to S$20 million on sales of S$1.5 billion.  The company's jet fuel shipments to China rose one-third to 1.6 million metric tons last year.  That accounted for 34 percent of China's total jet fuel consumption.  (emphasis added.)

33.     On November 26, 2001, *Bloomberg* issued a press release, entitled "China Aviation Aims to Raise S$80 Million in Initial Share Sale," which stated in part:

> China Aviation Oil (Singapore) Pte., which supplies 99 percent of the jet fuel China imports, said it plans to raise S$80 million ($44 million) in the largest share sale in Singapore this year.
>
> It plans to sell 144 million new shares at S$0.56 apiece, or one-quarter of the company.  ***The company plans to use S$57 million to set up joint ventures or investments in China and Hong Kong, S$15.5 million to buy companies in the U.S. and Europe and the reminder general working capital***.
>
> The company is a unit of the state-owned China Aviation Oil Supply Corp., which supplies jet fuel to foreign and domestic airlines at more than 100 airports in China.  (emphasis added.)
>
> DBS Group Holdings is handling the sale.

34.     On November 26, 2001, the Company went public selling 144,000,000 shares, raising proceeds of $44 million, *vis-a-vis* a prospectus.  With respect to risk management and the Company's internal controls, the Company's prospectus stated in relevant part:

***Risk Management***

On 1 October 2000, we established a Risk Management Committee to monitor and control our risk exposure arising from physical and derivative trades at all times, and have adopted a set of risk management procedures that govern our physical and derivatives trades.

*        *        *

On July 2001, we implemented a stop loss limit of US$500,000 for each Paper Trader for his trades in paper swaps and oil futures to minimize risk exposure to our Company. As we currently have three Paper Traders, the aggregate loss limit for our Company is US$1.5 million. Moreover, when the total mark-to-market unrealized loss for a Paper Trader has reached US$200,000 at the end of a trading day, the Managing Director, Mr. Chen and the Risk Management Committee and the trader will be put on alert by our Risk Controller. In the event that the loss reaches the US$500,000 limit, all open positions must be closed unless approval from the Managing Director, Mr. Chen is obtained. Only upon his approval can the positions in excess of the limit be carried out. These positions will be monitored closely by the Paper Trader and the Risk Controller.

### Risk Management Procedure for Hedging with Paper Swaps

When a trader is engaged in a physical trade, he will identify and quantify the expected underlying risk exposure and communicate the exposure to another trader who trades in paper swaps ("Paper Trader").

*        *        *

### Risk Management Procedure for Opportunistic Trading in Paper Swaps

Our Paper Traders are authorized by our Managing Director to trade in paper swaps. Our traders may take open positions when they are of the view that their open positions would likely allow profit from the market trend based on their market experience. The Paper Trader will have to strictly adhere to the trading strategy and observe the stop loss limit. Once the open position is created, the Paper Trader will monitor the market and his open position on a 24-hour basis through his oil broker. As in the case for hedging, the Paper Trader will submit the trade details to the Risk Controller who will check the details before recording them into the centralised database.

35.    On March 13, 2002, the Company issued a press release, entitled "China Aviation Oil

Full Year Profit Up 200%," which stated in part:

Singapore Mainboard listed China Aviation Oil (Singapore) Corporation Ltd (CAO), a jet fuel procurement and petroleum products trading company, today announced its financial results for the twelve months ended December 31, 2001:

- 10 -

|  | FY 2001 | FY 2000 | % Change |
|---|---|---|---|
| Turnover | $1,051.0 m | $963.7 m | +9.1 |
| Gross Profit | $44.8 m | $42.9 m | +4.5 |
| Profit Before Tax | $44.5 m | $16.2 m | +174.7 |
| Profit After Tax | $40.6 m | $13.5 m | +200.3 |

*       *       *

Chairman of CAO Mr. Jia Changbin said the results confirmed the company's strong financial position following its listing in December 2001.

"The growth of the aviation sector in China continues to drive revenue growth for the company."

"Demand for jet fuel in the PRC is expected to grow by over 10% a year over the next decade," Mr. Jia said.

*       *       *

INTERNATIONAL TRADING

The Chinese Government has begun opening up the petroleum products market by allowing 20% of goods to be imported.  This is a first step towards lifting the import quota altogether in January 2004.  This will allow CAO to increase the volume of petroleum products imported into China while at the same time maintaining the company's jet fuel procurement rights.

"CAO is well positioned to benefit from the growing importation of petroleum products into China due to our established networks and understanding of the Chinese business environment."

"The company already has the required capabilities such as experienced traders, transport networks, credit facilities, relationships with suppliers and risk management procedures."

In line with industry practice, the company will continue to use paper swaps and futures as part of a conservative hedging policy to ensure we lock in our profits."

*       *       *

CONCLUSION

The strategy of growing the trading and investment arms of the business should deliver strong earnings growth over the next few years.

"Jet fuel procurement, trading and investment will all contribute substantially to the company's revenue next year," Mr. Chen said. (emphasis added.)

36.     On July 23, 2002, *Bloomberg* reported that China Aviation was going to buy a fuel supplier.  The article stated in part:

> China Aviation Oil (Singapore) Corp. said it agreed to buy one-third of the sole jet fuel supplier to Shanghai's new airport, which may increase 2002 profit by S$20 million ($11.5 million) to a record.
>
> China Aviation, which supplied 97 percent of China's jet fuel imports last year, agreed to buy 33 percent of Shanghai Pudong International Airport Aviation Fuel Supply Corp. for 370 million yuan (S$78 million).  It first announced its intention to buy the stake from its parent China Aviation Oil Supply Corp., a state-run company, more than a year ago.
>
> "This acquisition will be a significant contribution to China Aviation's earnings," said Chen Jiulin, chief executive of the company, whose shares are traded in Singapore.  Chen declined to give further details on earnings forecasts.

37.     On March 27, 2003, the Company issued a press release, entitled "Full Year Financial Statement And Dividend Announcement," which stated in part:

**Review Of Performance**

> Turnover increased by 60.8% from S$1,051.0 million to S$1,689.6 million.  The Group has actively built up its international trading activities through the recruitment of experienced traders.  This doubling of the oil trading team to 10 traders has resulted in a large increase in the revenue base of international trading, especially in the black petroleum and crude oil segments.  Black petroleum products and crude oil together accounted for about 50% (S$851,531) of the turnover in 2002, compared to only 27.6% in 2001.
>
> Gross profit, excluding that in the area of strategic investment, slipped 14.5% to S$38.3 million from S$44.8 million, due mainly to two factors.  More customers have requested for floating price contracts, instead of the fixed contracts in the past, to better track the prevailing market conditions.  The Parent Group had negotiated for reduced commissions to which CAO had agreed to in view of continuing long-term benefits.  In return, upon representation by CAO, the Parent Group had agreed to drop its request for management fees which was provided for previously in 2000.  In addition, the Group also started trading in new products whose margins are traditionally thin.  To establish its market presence, the Group was aggressive in its pricing to build up the base for future trades.
>
> In July 2002, the Group finalised and signed two agreements pertaining to its strategic investments in a 33%-equity stake in Shanghai Pudong International Airport Aviation Fuel Supply Corporation Ltd ("SPIA/AFSC") and a 5%-equity stake in Spanish oil giant Compania Logistica de Hidrocaburos S.A. ("CLH").  The

respective agreements provided for the Group's share of SPIA/AFSC's profits and share of dividends from CLH to accrue from 1 January 2002.

SPIA/AFSC is the sole supplier of jet fuel at the Shanghai Pudong International Airport (SPIA) and the owner of a 42 km pipeline directly connecting SPIA to Shanghai Wai Gaoqiao port.  CLH owns the largest network of oil pipelines and storage facilities throughout Spain and has an 83% market share of its gasoline and gas oil distribution, and 100% market share of its jet fuel distribution.  CLH offers the Group a solid base in Europe from which to extend its jet fuel business in the European market.

38.    Also on March 27, 2003, the Company issued a press release entitled "China Aviation Oil Reports Significant Gains in 2002 From Its Successful 3-Pronged Strategy."  The article stated in part:

Mainboard-listed China Aviation Oil (Singapore) Corporation Limited ("CAO") released its results for the financial year ended 31 December 2002 ("FY 2002") and said its strategy to strengthen the Group's revenues and profitability through downstream investments in oil and gas-related infrastructure to complement its jet fuel procurement and international oil trading businesses has paid off handsomely.

CAO said that based on the agreements it had signed for two major investments in FY 2002 which had provided for CAO's share of profits and dividend distribution to accrue from January 2002, the Group had recorded pro-forma profit before tax of S$66.5 million and net profit after tax of S$57.9 million, thus registering pro-forma year-on-year growth of 49.5% and 42.9%, respectively.  Of the total interim dividends from CLH for 2002, 2.5 million Euros (S$4.6 million) were received in March 2003, and will be reflected in the FY 2003 results.

However, in adopting the accounting treatments of offsetting against the respective costs of investments for both CAO's share of profits from SPIA/AFSC for the period 1 January to 30 June 2002, as well as the first dividend payment by CLH in July 2002 for 1.4 million Euros (S$2.4 million), the Group recorded a profit before tax of S$54.6 million for FY 2002 (22.8% increase over FY 2001) and a net profit after tax of S$48.2 million (18.9% increase over FY 2001's S$40.6 million).

In July 2002, the Group invested in a 33%-equity stake in SPIA/AFSC, the sole supplier of aviation fuel at the Shanghai-Pudong airport, and a 5%-equity stake in CLH, Spain's leading company in the petroleum transportation and storage market and the owner of an exclusive network of oil pipelines and storage facilities in the country.

The two investments comprised the third prong of CAO's long-term strategy to reduce dependence on jet fuel procurement for the civil aviation industry in China, and to position the Group to emerge as an international player in downstream oil and

- 13 -

gas-related infrastructure and logistics and also as a major international oil trading company.

Group revenue jumped 60.8% to S$1.69 billion from FY2001's S$1.05 billion. The higher revenue in FY 2002 was attributed to CAO's doubling of its trading team to 10 experienced traders. This resulted in a significant increase in the revenue base of international oil trading, in particular a 97%-rise in revenue to S$527.7 million from Black Petroleum Products, which include fuel oil used as fuel for power stations and marine boilers, and also contributions from crude oil trading.

Said Mr. Chen Jiulin, CAO's Managing Director and CEO, "The uncertainties in the global market worsened by the then-imminent U.S. military strike against Iraq made 2002 a challenging year. Against this difficult operating environment, our strategy of pursuing downstream integration into oil and gas-related infrastructure and industrial businesses and expanding our international oil trading has stabilised the Group's performance.

We are also optimistic of forging strategic alliances with international players in the near future. Going forward, the Group is fundamentally in a much stronger position now and able to capitalise on more opportunities that will springboard the Group towards our vision of becoming a global player in the oil industry."

39. On July 18, 2003, *Bloomberg* reported that China Aviation was borrowing $160 million to fund future spending. The article stated in part:

China Aviation Oil (Singapore) Corp., which supplies a third of China's jet fuel, will borrow $160 million from a group of 10 banks to help fund future spending.

The Singapore-based company signed an agreement with banks including China Everbright Bank, China Merchant Bank and Societe Generale Asia, Chen Jiulin, chief executive of China Aviation, told reporters.

The fuel trader is considering investments in the U.S., China and Southeast Asia, Chen said, without elaborating.

40. On August 29, 2003, the Company issued a press release, entitled "1H/2Q Financial Statement Ended 30 June 2003," which stated in part:

**Review Of Performance**

The Group achieved net profit after tax of S$11.3 million for the second quarter of 2003 compared to S$7.9 million for the corresponding period of 2002, an increase of 41.9%.

- 14 -

Revenue increased 15.7% to S$465.8 million from S$402.6 million in second quarter 2002, a result of the Group increasing the number of professional traders employed.

The 41.9% increase in net profit is attributed to the Group's three-prong strategy – investing in oil-related assets, expanding international oil trading and jet fuel procurement which was fully realised from July 2002 with the acquisition of equity stakes in Spanish oil giant Compania Logistica de Hidrocarburos ("CLH") and Shanghai Pudong International Airport Aviation Fuel Company ("Pudong").

The increase in Other Income of 15.6% is substantially due to the receipts of these dividends from CLH for FY 2002, equivalent to S2.3 million in the second quarter of 2003.  Share of results of associate company Pudong amounted to S$8.7 million. Thus, CAO's two strategic investments contributed 77% of the Group's pre-tax profits.

The outbreak of the SARS epidemic during the second quarter further underscored the effectiveness of the Group's three-pronged strategy in stabilising profits.  The short-term negative effect of SARS on the Group's jet fuel procurement business and Pudong's operations as outlined in the Group's announcement on 7 May 2003 did not extensively affect the Group as anticipated.  As the authorities in China were able to contain the virus from spreading further, demand of jet fuel imports have since rebounded in July 2003 in line with the increasing reinstatement of flights back to pre-SARS levels.

Gross profit decreased to S$6.5 million compared to S$10.9 million, a decrease of 40.6%.  This was due to the reduction of commission for jet fuel procurement beginning from the second half of 2002.  Another contributing factor was that the margins for new products traded from the second half of 2002 are traditionally low.  These factors, coupled with the fact that the Group has to trade margin to establish its presence in the international oil market, reduced the gross profit of the Group.

**Commentary On Prospects**

\*       \*       \*

*Strategic investments, international oil trading and jet fuel procurement are all on track for growth in the current quarter*.  Further normalization of procurement volumes should be seen in the fourth quarter as well.

*In July 2003, the company signed a syndicated loan agreement with 10 banks for a transferable term credit facility of US$160 million.  The proceeds of the loan would be used for working capital and to finance any investment opportunities that may arise.  Whether the loan is ultimately drawn down and how much of it would be drawn down depends on the investment opportunities that the company has been considering, including possibilities in the US, China and*

- 15 -

***ASEAN.  The impact on earnings if the loan is utilized depends on the amount of draw down and the use of the loans***. (emphasis added.)

41.     On or about November 15, 2003, the Company issued a press release, entitled "3Q Financial Statement Ended 30 September 2003," which stated in part:

**Review Of Performance**

The Group achieved net profit after tax of S$10.4 million for the third quarter of 2003 compared to S$8.0 million for the corresponding period of 2002, an increase of 29.2%.  Turnover increased by S$10.0 million or 2.0% to S$511.8 million from S$501.8 million in third quarter of 2002.

Gross profit increased to S$13.4 million compared to S$6.6 million, an increase of 101.4%.  Record sales of jet fuel procurement volume posted in the third quarter of 2003 coupled with healthy international oil trading profitability contributed to the strong growth in the gross profit.

Operating expenses increase by S$3.4 million due to the increased number of staff that the Group employed for its expansion in international oil trading, including traders and the necessary support staff.  In addition, the Group incurred S$2.8 million arrangement fee for its syndicated loans, which were expensed in 3Q 2003.

The Group's share of profits before tax from associated companies decreased from S$9.1 million in 3Q 2002 to S$6.6 million in 3Q 2003, a decrease of 27.7%. The decrease was due to an increase in international oil prices without any corresponding increase in selling price, which is set by the Chinese Government, and the mix between imports and domestic supply that the Pudong associate provided.

In 3Q 2003, the Company received from Pudong a distribution of retained earnings of RMB 39.6 million (S$8.3 million) accrued in years prior to 2002.  This was offset against the purchase price for Pudong.  In addition, the company received from Pudong a dividend of RMB 105.6 million (S$22.4 million), which was paid out of the financial year 2002 profit.  The distribution of the retained earnings and the dividend from financial year 2002 profit have no effect on the results of the Group.

In July 2003, the Group signed a syndicated loan agreement with 10 banks for a transferable term credit facility of US$160 million.  The proceeds of the loan would be used for working capital and to finance any investment opportunities that are successfully negotiated by the Group.  As of the date of this announcement, the loan facility has not been drawn down.

**Commentary On Prospects**

There has been a steady increase in jet fuel procurement volume for China since the ending of the SARS epidemic.  The 3rd quarter jet fuel procurement

- 16 -

volume was the highest to-date, and the Group expects the 4th quarter procurement volume to be the highest for the year 2003.

The Group is currently engaged in negotiations to invest in assets in China, USA and ASEAN. The conclusion of any deal depends on the Group being satisfied that the investments meet or exceed the investment criteria laid down by the Group – must be oil related; may involve infrastructure; must offer opportunity for synergy with our existing business lines, and more broadly with the Group three-pronged strategy; and must be available at a fair price.

The Group expects that the current soft interest rate environment may change in the near term. The US economy is expected to grow, and though pronouncements have been made to the effect that the US Federal Reserve is not expected to adjust rates in the near term, the Group has had discussions with banks on the possibility of hedging interest rate exposure on the syndicated loan in the event that the syndicated loan is drawn down.

The reduction in Shanghai Pudong's gross margin is expected to carry forward to the 4th quarter of 2003. As in the 3rd quarter, the effect will carry through to the net profit of Shanghai Pudong and ultimately the Group's share of Pudong's net profit. However, the effect on the Group's performance may be offset by contributions from the volume increase in jet fuel procurement.

42.    The aforementioned statements were alive and uncorrected at the beginning of the

Class Period.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

43.    On or about February 5, 2004, the Company issued a press released, entitled "Full

Year Financial Statement Ended 31 December 2003," which stated in part:

**Review Of Performance**

The Group achieved net profit after tax of S$54.3 million for the year 2003 compared to S$48.2 million for the year 2002, an increase of 12.6%. The net profit before tax was S$67.1 million, an increase of 22.8% over 2002.

The 2002 results included exceptional items of S$12.7 million. If the exceptional items of S$12.7 million were excluded, the 2003's profit before tax would be an increase of 60% over 2002.

The result includes profit contributions from all three-business segments of the Group, namely investment, international oil trading and jet fuel procurement.

Investment profit contributions were from dividends paid by Compania Logistica De Hidrocrburos [sic] S.A. and the equity accounting for 33% of the results of Shanghai Pudong International Airport Aviation Fuel Supply Company Ltd ("Shanghai Pudong").  This is the first year that the Group will be including the whole year result of Shanghai Pudong – investment income is and will continue to be biggest contributor to the net profit of the Group.

International oil trading and jet fuel procurement also contributed to the net profit of the Group.  This was despite the difficult trading environment during the period due to circumstances outside its control.  The Iraqi war started in March 2003. The lead up to the war and the war itself caused oil prices to fluctuate substantially. In April 2003, the SARS epidemic hit China, Hong Kong, Singapore and as far as Canada.  Air travel was substantially reduced, and many airlines cancelled their number of flights by 50% on average.  In addition, the Group suffered a reduction in commission for its jet fuel procurement business from the second half of 2002.

Turnover increased by S$735.5 million or 43.5% to S$2,425.1 million.

Trading gross profit increased to S$46.1 million compared to S$38.3 million, an increase of 20.3%.  The gross profit margin has remained relatively stable despite the challenges presented by the Iraq war and the SARS epidemic, causing oil prices to fluctuate significantly, and significant drop in the demand for jet fuel.

Operating expenses increased by S$9.1 million due to the increased number of staff that the Group employed for its expansion in international oil trading, including traders and the necessary support staff.  The increase in staff related costs is inevitable as skilled traders are in high demand and command good remuneration. In addition, the number of support staff had to be strengthened in order to adequately support the number of traders in international oil trading and jet fuel procurement.  In July 2003, the Group signed a US$160 million credit facility.  The arranger fee of US$1.6 million was paid in August 2003, and the full fee was expensed off.  The operating expense also included a full year's amortization of goodwill for the acquisition of Shanghai Pudong.

The Group's share of profits before tax from its associated company increased from S$20.4 million in 2002 to S$34.5 million in 2003, an increase of 68.9%.  This is the first year that the Group accounted for the full year results of its associated company. This result was lower than expected. Shanghai Pudong has seen declining margins from the beginning of 2003.  The erosion in gross margin essentially was due to the increases in international oil prices without any corresponding increase in the selling price which was held constant by the authorities in response to the decline in air travel during the SARS crisis.

During 2003, the Company received from Shanghai Pudong's distribution of retained earnings of RMB 39.6 million accrued in years prior to 2002.  This was offset against the purchase price for Shanghai Pudong.  In addition, the company received from Shanghai Pudong a dividend of RMB 105.6 million, which was paid

- 18 -

out of the financial year 2002 profit. The distribution of the retained earnings and the dividend from financial year 2002 profit have no effect on the results of the Group. In addition, the Company received 3 dividends from its investment in Compania de Logistica Hidrocarburos (CLH).

In July 2003, the Group signed a syndicated loan agreement with 10 banks for a transferable term credit facility of US$160 million. The proceeds of the loan would be used for working capital and to finance any investment opportunities that are successfully negotiated by the Group. As of the date of this announcement, the loan facility has not been drawn down.

**Final Dividend and Bonus Issue**

The Board of Directors has proposed a tax-exempt cash dividend of S$0.035 per ordinary share and a bonus issue (the "Bonus Issue") on the basis of 2 new ordinary share ('Bonus Share") [sic] of S$0.05 each credited as fully paid for every 5 existing ordinary shares of S$0.05 each held in the capital of the Company at a book closure date to be determined (the "Books Closure Date"). Fractional entitlements are to be disregarded and will be disposed of in such manner as the Directors in their absolute discretion deem fit for the benefit of the Company.

The Bonus Shares, when allotted and issued, will rank *pari passu* in all respects with the existing issued shares of the Company, except that they will not be entitled to the tax-exempt cash dividend of S$0.035 per ordinary share declared in respect of the financial year ended 31 December 2003.

The rationale for the proposed Bonus Issue, subject to the approval of the shareholders, is to increase the number of shares in issue that are available for trading in the market, thereby improving the liquidity in the market and to reward loyal shareholders for their continued support of the Company.

The Bonus Issue will entail the capitalisation of approximately S$13.824 million from the Company's share premium account to be applied towards paying up in full for the Bonus Issue. The number of Bonus Shares that will be issued by the Company pursuant to the Bonus Issue is approximately 276.48 million; Bonus Shares based on the Company's Issued Capital of 691,199,999 shares.

The Bonus Issue is subject to the approval of the Singapore Exchange Securities Trading Limited ("SGX-ST") for the listing and quotation of the Bonus Shares on the main board of the SGX-ST. The Company will make an application to the SGX-ST for permission to deal in and for listing and quotation of the Bonus Shares on the main board of the SGX-ST.

**Commentary On Prospects**

There has been a steady increase in the jet fuel procurement volume for China since the eradication of SARS. The 1st quarter jet fuel procurement volume is set to be the highest to-date. The Group expects the procurement volume to maintain at or

- 19 -

exceed the level of 2003.  Despite the recent confirmation of SARS cases and the increase in the number of bird flu cases, the Group remains confident that it would be able to ride out the rough times as its did during 2003.

In December 2003 and February 2004, the Group announced the agreements to purchase 80% and 24.5% in Shuidong oil storage facilities and Bluesky Aviation Oil Co Ltd respectively.  These acquisitions are expected to contribute to the Group's performance.

Shanghai Pudong's gross margin, which saw a gradual reduction during 2003, is expected to stabilize in 2004.  As is the case in 2003, the effect on the Group's performance may be mitigated by contributions from the volume increase in jet fuel procurement.

This press release was published in English and disseminated in the United States via China Aviation's website.  It did not disclose that the Company had commenced speculative options trading in the first quarter of 2003.

44.     On or about April 15, 2004, the Company issued a press release, entitled "First Quarter Financial Statement Ended 31/03/2004," which stated in part:

**Review Of Performance**

On a comparable basis, excluding the dividend from CLH in 2003, the Group achieved an increase in net profit after tax of 12.6% to S$16.2 million.  The results for the 1st quarter 2003 included a dividend of S$ 4.7 million from CLH, which was received and booked in 1Q 2003.  There was no dividend for 1Q 2004 as the corresponding dividend was received and booked in the last quarter of 2003.  If the dividend received in 1Q 2003 was included, the net profit decreased by 10.7%.

All segments of the Group contributed to the net profit of the Group. Investment profit contributions this quarter came from the equity accounting for 33% share of the results of Shanghai Pudong International Airport Aviation Fuel Supply Company Ltd ("Pudong").  International oil trading and jet fuel procurement also contributed to the net profit of the Group.

In view of the market turbulence and the high trading risks during the period, the management took a conservative stance to control the trading volume.  Therefore turnover decreased by S$56.5 million or 8.8% though the Group's jet fuel procurement to China has increased.  The conscious effort by the Group to exercise caution resulted in a higher gross profit of S$15.2 million, an increase of 11.4% despite a reduction of turnover of 8.8%.

- 20 -

Operating expenses increased by 26.6% due to increases in staff and travel costs. In addition, the Group paid an extension fee to the banks for extending the availability period of the syndicated loan, which has not been drawn down.

During the 1st quarter, the Group announced an agreement to acquire a 24.5% stake in South China Bluesky Aviation Oil Co Ltd ("Bluesky"). The Group also announced the signing of a non-binding Memorandum of Understanding ("MOU") with Emirates National Oil Company Limited ("ENOC") to take up a 20% equity stake in Horizon Terminals Limited ("HTL"). A separate MOU was signed with HTL for CAO to take a 25% equity stake in a joint venture to build, own and operate a bulk liquid terminal in Banyan on Singapore's Jurong Island.

**Commentary On Prospects**

In April 2004, a SARS suspect was diagnosed in Beijing. This brought back memories of the SARS episode in 2003 when the number of travelers was significantly reduced with dire impact on the profitability of airlines, tourism and jet fuel sales. Though several cases were subsequently confirmed, the authorities in China moved quickly and brought the situation under control. Jet fuel sales have not been affected by the SARS cases as the volume for the 2Q 2004 reached 630,000 metric tonnes, and in the words of Mr. Chen Jiulin, Managing Director and CEO of CAO, this is "a clear signal that China's aviation industry is confident of continual performance despite the initial cases of SARS reported in China."

The due diligence on the acquisition of Bluesky has been completed and an application has been filed with the Chinese authorities for the approval of the acquisition. Discussions are also underway with ENOC on the acquisition of HTL shares and also the joint venture bulk liquid terminal.

The press release was published in English and disseminated in the United States via Chian Aviation's website. This press release was materially false and misleading because it did not disclose that profit before taxes was actually a *loss* of S$6.4 million, not the profit of S$19 million reported.

45.     On August 12, 2004, the Company issued a press release, entitled "Half Year Financial Statement Ended 30/06/2004," which stated in part:

**Review Of Performance**

The Group achieved an increase in net profit after tax of 48.6% to S$16.7 million for the 2Q 2004 compared to the same period last year.

- 21 -

Turnover was S$741.9 million, an improvement of 30.6% over 2003. With the volatility of the market, together with tight risk management procedures, the Group improved gross trading margin from 1.1% in 2003 to 1.3% in 2004.

Contributions from investments were from the equity accounting of Shanghai Pudong (SPIA) and dividend from Compania Logistica de Hidrocarburos (CLH). SPIA contributions before tax increased by 48.2% compared to the 2003, whilst CLH dividend matched that of 2003.

A new subsidiary, Xinyuan, was set up to buy over the assets of Shuidong Tank Terminal in June 2004. As at the end of second quarter 2004, the outstanding balance in respect of SPIA's acquisition was settled in full.

Operating expenses increased by 43.1% due to increases in travel and financing costs.

The Group drew down the syndicated loan of US$160 million in June.

The Company has been awarded the Global Trader Programme 5% tax incentive for a period of 5 years from 1 January 2004. This supercedes the previous award which granted a concessionary tax rate of 10%.

**Commentary On Prospects**

The 3rd quarter 2004 initial bulk purchase contract was for 630,000 metric tonnes. This is a new record for tendered volume on a quarterly basis, representing growth of some 16% over the 3rd quarter 2003.

The acquisition of Fortune Aviation Holdings is progressing well, and in-principle approval has been given by SGX on the listing and quotation of the new shares to be issued for the acquisition, subject to the final approval by Chinese Authorities.

The New Guangzhou Baiyun International Airport commenced operations on 5 Aug 2004 and has become the largest airport in China. Its passenger capacity is expected to reach 25 million in 2005, five years ahead of the original plan.

According to an article in Lianhe Zaobao dated 11 August 2004 on the new airport "Beyond White Cloud is Bluesky," the total jet fuel consumption at Guangzhou Baiyun airport is expected to increase 46% compared to 2003, to reach 650,000 metric tonnes in 2004 and 850,000 metric tonnes in 2005. Bluesky, the exclusive supplier of aviation fuel to 15 airports in Southern China including the Guangzhou Baiyun airport, is expected to benefit directly from the switch to the new airport, with profits for 2004 and 2005 from Bluesky's operations at this airport alone projected to grow by 22% and 23% to RMB121 million and RMB149 million respectively. In addition to future contribution from associated company Bluesky, the significant increases in demand for jet fuel at the new Guangzhou airport will also boost CAO's jet fuel procurement operations.

This press release was published in English and disseminated in the United States via China Aviation's website.  This press release was materially false and misleading because it reported profit before tax as S$19.3 million, when the Company actually *lost* S$58 million.

46.    On August 31, 2004, the Company issued a press release entitled "China Aviation Oil's Jet Fuel Procurement Volume Hits Record Of 2.59 million Metric Tonnes In 2004, Up 30.2% From 2003."  The press release stated in part:

> SGX Main Board-listed China Aviation Oil (Singapore) Corporation Ltd ("CAO") announced that its initial tender for jet fuel procurement volumes during the October-December quarter was some 43.8% higher than the initial tender for the comparative period a year earlier.  It also announced that full-year procurement volumes would be at least 30% higher than those recorded in 2003, reaching a record 2.59 million metric tonnes.
>
> *Mr. Chen Jiulin, CAO's Managing Director and CEO, said, "The large size of the upcoming quarter's fuel requirements is strong evidence that the commercial aviation sector in China remains robust.  As the substitution of imported jet fuel for domestic production began in the latter part of 2003, the effect of such substitution on year-on-year comparisons has now been eliminated. Despite this, the numbers still definitively point to an upward trend*."
>
> **A record year is clinched.**
>
> CAO, on 24 August, issued an invitation to tender for 630,000 metric tonnes of jet fuel, to be delivered during the October-December quarter.  The tender closed 30 August and negotiations are underway with suppliers, including (among several others) Singapore Petroleum Company, in which CAO recently acquired a 20.6% stake.  This tender is 43.8% higher than the initial tender made for the October-December 2003 quarter, and in line with the 630,000-tonne order placed for the July-September 2004 quarter.  It is the fifth consecutive quarter in which volumes have exceeded 600,000 metric tonnes.  In fact, the current fiscal year is the first in which volumes have exceeded 600,000 metric tonnes in all four quarters.
>
> It should additionally be borne in mind that in most quarters, the initial bulk purchase proves insufficient to meet total quarterly demand, and additional spot tenders are required.  In the October-December 2003 quarter, for instance, the initial 438,000-tonne order grew to 662,000 metric tonnes.  It is thus reasonable to expect additional spot tenders in the upcoming quarter as well, and these will result in even higher growth.
>
> For the full year 2004, the initial tender puts total procurement volume at 2,588,000 metric tonnes.  This is 30.2% higher than the 1,988,000 metric tonnes

- 23 -

recorded in 2003.  If additional spot tenders take place between now and the end of the year, the total growth will naturally be higher still.

CAO's Chairman, Mr. Jia Changbin added: "On top of all the other positive news we have so far reported this year, it is gratifying to see that jet fuel procurement, one of our core businesses, remains so buoyant.  As we have been saying over the past several months, ***CAO is clearly on track to report record earnings in the current fiscal year***."

This press release was published in English and disseminated in the United States via China Aviation's website.  This press release was materially false and misleading because the Company actually lost S$314.6 million in the third quarter, instead of the reported profit of S$11.3 million.

47.     By September 2004, rumors about the Company's prospects caused the Company's shares to trade erratically.  On September 17, 2004, the Company wrote a letter to Singapore Exchange Securities Trading Limited in response to a query regarding trading activity.  The letter stated in part:

> Ms. Elsie Chua
> Singapore Exchange Securities Trading Limited
> 2 Shenton Way
> #19-00 SGX Centre 1
> Singapore 068809
>
> Dear Ms. Chua
>
> We refer to your letter dated 17 September 2004 in relation to a substantial increase in the price and trading volume of our shares today. Our replies to your questions are as follows:
>
> Question 1:  Are you aware of any information not previously announced concerning you (the issuer), your subsidiaries or associated companies which, if known, might explain the trading?
>
> The Company is not aware of any information not previously announced that might have led to the substantial increase in the price and trading volume of our shares today.
>
> Question 2:  ***Are you aware of any other possible explanation for the trading***?

> ***The Company is not aware of any other possible explanation for the
> trading***.

> Question 3:  Can you confirm your compliance with the listing rules and, in
> particular, Listing Rule 703?

> The Company confirms that it is in compliance with the listing rules of the
> SGX-ST, in particular Rule 703.  (emphasis added.)

None of the Company's press releases during the Class Period corrected the statements concerning

risk control measures in the Prospectus, and the September 17, 2004 letter continued to conceal the

massive derivative losses and violations of the risk management control guidelines.

48.     On October 10, 2004, defendants told the controlling shareholder about the massive

derivative losses which had grown even greater.  In response, under defendant Chen's direction, the

controlling shareholder dumped $119 million worth of its shares on the unsuspecting public 10 days

later, in a private placement.

49.     On October 20, 2004, *Bloomberg* reported that "China Aviation Says Parent Sold

15% Stake; Lifts Trading Halt."  The article stated in part:

> China Aviation Oil (Singapore) Corp., which supplies a third of China's jet
> fuel, said its parent China Aviation Oil Holding Co. sold a 15 percent stake in the
> company.

> The shares were sold to institutional investors and Deutsche Bank AG's
> Singapore unit was the book runner for the placement, the company said in a filing
> with the Singapore Exchange.  The statement didn't give more details.

50.     On October 31, 2004, Deutsche Bank issued a press release, entitled "Deutsche Bank

Successfully completes equity placement for China Aviation Oil."  The press release stated in part:

> Deutsche Bank today announced that it successfully completed an equity
> placement of $196 million for China Aviation Oil Holding Company ("CAOHC") by
> way of an underwritten accelerated book-building exercise.  The placement was
> made up of 145,152,000 million vendor shares amounting to approximately 15% of
> the share capital of China Aviation Oil (Singapore) Corporation Limited ("CAO").
> The transaction was well oversubscribed, with the final price being set at S$1.35 per
> share. Deutsche Bank underwrote and was sole bookrunner on the placement.

*Keith Magnus, Deutsche Bank's Head of Country Banking, Global Corporate Finance, Singapore said: "The placement was executed within four hours and the shares were placed widely to institutional investors with a strong response from the market. This transaction is positive for the company as it diversifies its shareholder base. It also underlines the strength of Deutsche Bank's Equity Capital Markets platform in Asia and our ability to raise capital for Singaporean corporates during difficult market conditions."*

Rowena Chu, Deutsche Bank's Head of Equity Capital Markets Asia said: "The block represents around 38 days daily trading volume for the stock, using the last six months as an average. Deutsche Bank's ability to complete a transaction of this size, in a day when all Asian markets were down, speaks well for the franchise we have built across the region. The investor base was truly diverse, with over 50 accounts participating. Around 75 per cent were from Asia, with the remainder coming from Europe and other offshore accounts." (emphasis added.)

The real reason for the sale of the 15% stake was to cover margin calls on the speculative options trading losses.

51.     On November 16, 2004, *Bloomberg* reported that "China Aviation Cuts Derivative Trading; Shares Rise." The article stated in part:

*Shares of China Aviation Oil (Singapore) Corp., which supplies a third of China's jet fuel, rose as much as 3.2 percent after the company said it will end speculative trading of derivatives to reduce the risk of losses.*

The company will by the end of this month "exit all speculative trading positions and will focus solely on the physical trading business" because of market volatility, it said in a statement yesterday evening. The only derivatives trading will be for the hedging of cargoes, it said.

China Aviation's third-quarter profit fell 15 percent because of losses in its international oil trading division after the "steep increase in oil prices," the company said in a statement last week without giving further details. Crude oil rose as much as 71 percent this year to a record $55.67 a barrel on Oct. 26 in New York. Since then, oil has fallen 17 percent.

"The important thing is that we curtail the risks that that business is incurring," John Casey, a spokesman for China Aviation Oil (Singapore), said in a telephone interview. The company said its jet fuel supply business remains profitable.

The stock rose as much as 40 cents to S$1.30 and traded at S$1.20 at 12:22 p.m. Singapore time. The shares have gained 72 percent over the past year.

Casey wouldn't say whether the decision to end speculative trading of derivatives would lead to job losses among the ten traders in the company's two Singapore-based trading teams.  One team trades jet fuel and the other trades crude oil, gas oil, naphtha and other oil products, he said.

"*Speculative trading comprises the majority of the trading of the group,*" *Casey said*.

52.     On November 26, 2004, *Bloomberg* reported that "Societe Generale Scraps Loan for China Aviation, Times reports." *Bloomberg*'s report stated in part:

Societe Generale SA has scrapped a S$300 million ($183 million) syndicated loan for China Aviation Oil (Singapore) Corp. after the company's Beijing-based parent blocked a plan to buy a stake in Singapore Petroleum Co., *Straits Times* said, citing an unidentified spokesman from the bank.

French bank Societe Generale was the lead arranger for the loan with 10 other lenders including Industrial and Commercial Bank of China, the Singapore-based newspaper said.

China Aviation Oil Holding Co., which controls about 60 percent of the unit's shares, voted against a resolution to buy a 20.6 percent stake in Singapore Petroleum, the island's only publicly traded oil refiner.

53.     On November 30, 2004, *Bloomberg* reported that "China Aviation Seeks Court Protection After $550 Mln Oil Loss."  The article stated in part:

China Aviation Oil (Singapore) Corp., supplier of a third of China's jet fuel, will ask Singapore's High Court for protection from creditors after losing about $550 million from bad bets on oil prices.

54.     On November 30, 2004, *Bloomberg* reported that "Singapore Shareholder Group 'Shocked' by China Aviation Loss."  The article stated in part:

The Securities Investors Association Singapore, a group representing retail investors in the city-state, said it's "shocked" by China Aviation Oil (Singapore) Corp.'s $550 million loss from bad debts on the price of oil.

"To the shareholders, it's a corporate earthquake, ..." David Gerald, president of the group, said in an interview.  "Is this another Barings?  They're asking."

55.     Also on November 30, 2004, *Bloomberg* reported that "China Aviation Oil Says It Lost $550 Mln From Derivative Trade."  The article stated in part:

- 27 -

China Aviation Oil (Singapore) Corp., which supplies a third of China's jet fuel, said it incurred losses of $550 million from derivative oil trading.

The company will propose a plan to creditors to pay debts and will ask the High Court of Singapore to fix a date to meet with creditors, the company said today in a statement to the Singapore Exchange.

56.     On this news, trading in the Company's shares was suspended after the shares dropped to below S$1.00 per share, compared to prices as high as S$1.70 per share, at which the shares traded during the Class Period.

57.     The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     that contrary to the Company's prospectus, the Company did ***not*** have the necessary risk management controls in place for hedging and trading;

(b)     that contrary to the private placement offering documents, the funds raised were not to fund an acquisition of the controlling shareholders but rather to meet margin calls for the massive derivative losses in the Company; and

(c)     that the Company's financial statements were grossly overstated or the Company was hiding liabilities totaling in excess of $550 million in derivative trading losses, as described in ¶¶53-57.

(d)     During fiscal 2004, the Company lost S$379 million, rather than the profit of S$49.6 million reported; and

(e)     The Company was engaged in speculative options trading but never disclosed such activities.

58.     Trading in China Aviation stock was suspended on November 30 and the Company sought bankruptcy protection in Singapore.

- 28 -

### POST-CLASS PERIOD STATEMENTS/REVELATIONS

59.    On December 1, 2004, a press statement was issued by Securities Investors Association (Singapore) entitled "China Aviation Oil's US$550 Million Derivatives Disaster."  The press release stated in part:

> Retail investors of CAO are in a daze.  This is because only recently the parent company of CAO sold a sizeable block of shares to unsuspecting fund managers at $1.35 per share.  Retail investors naturally took the position that if the smart money finds the stock attractive at $1.35, then at prices below that the stock must be a good prospect.  Quite clearly they got it wrong.  CAO had in the past repeatedly given assurances to investors that they had a good risk management system in place.
>
> When the third quarter results were announced, CAO should have disclosed its open positions and potential losses, which was material information to investors.  This is a failure in transparency.
>
> The immediate questions that arise in the minds of the troubled retail investors are:
>
> 1.  How did the company chalk up such a big loss within such a short time?
>
> 2.  Were the independent directors aware of the developments and if so what actions did they take?
>
> 3.  Did the auditors check the company to ensure that the risk control mechanisms put in place was [sic] in operation?  Were they ignored by the Management?
>
> 4.  Having a proper audit control and the necessary management controls internally, why was this allowed to happen?
>
> 5.  What recourse do the retail investors have?  Is it time to consider how the retail investors should be compensated or how their predicament can be addressed?
>
> It is totally unacceptable for the Management to have allowed losses to run to $900m which is more than 3 times the net worth of the company ($225 m as of 31 Dec 2003) and more than 20 times the annual operating profit of the company.

60.    On December 2, 2004, *Bloomberg* reported that "China Aviation Stake Was Sold to Cover Margin Calls, CEO Says."  The article stated in part:

China Aviation Oil Holding Co. brought forward the sale of a 15 percent stake in its Singapore subsidiary to cover margin calls, or funding requirements, on derivatives contracts that triggered $550 million of losses, according to a court filing.

The Oct 20 sale of a S$196 million ($119 million) stake in China Aviation Oil (Singapore) Corp., which this week sought protection from creditors, came 10 days after the unit told its parent of "potential losses" on derivative transactions, according to an affidavit filed in Singapore's High Court by the unit's chief executive, Chen Jiulin.

The affidavit was dated Nov. 29, a day before China Aviation disclosed the derivatives losses, and indicates the Chinese state-owned parent didn't tell stock buyers of the company's financial crisis. The Singapore exchange is investigating the unit and seeking Chen's return from Beijing.

"This transaction was conducted entirely in accordance with market practice," said Mike West, a spokesman for sale arranger Deutsche Bank AG. "The bank is cooperating with regulators in Singapore."

A loan of $100 million from the parent company wasn't enough to cover the unit's margins calls, the subsidiary said in a statement to the Singapore stock exchange on Nov. 30.

The parent "had an investment they are making and they need to raise the cash," John Casey, a spokesman for the Singapore unit, said in a telephone interview on Oct. 21, declining to comment further on the parent company's acquisition. "They wanted to get the deal completed as soon as possible."

Share Sale

Deutsche sold the shares at S$1.35 apiece within four hours, it said in a statement on Oct. 21, with three-quarters of investors from Asia and the remainder from Europe. The stock declined 8.9 percent when trading resumed on Oct. 21 after the sale. The shares were trading at 96.5 Singapore cents before they were suspended again on Nov. 29, a 29 percent decline from their placement price.

"This transaction is positive for the company as it diversifies is shareholder base," Deutsche said on Oct. 21. "It also underlines the strength of Deutsche Bank's Equity Capital Markets platform in Asia and our ability to raise capital for Singaporean corporates during difficult market conditions."

61.    On December 2, 2004, *Bloomberg* reported that "China Aviation Oil Parent Sold

Stock to Pay for Losses, FT Says."  The article stated in part:

China Aviation Oil (Singapore) Corp.'s parent company sold a 15 percent stake in the unit in October to help pay for the unit's losses on bets on the price of

- 30 -

oil, the *Financial Times* reported, citing an affidavit by Chen Jiulin, the chief executive of China Aviation Oil.

The China Aviation Oil unit informed its parent company, China Aviation Oil Holding Co., ***about the mounting losses on October 10***, when the deficit amounted to about $180 million, the newspaper reported, citing Chen's document, which it said was filed with Singapore's High Court.

***On Oct. 20, China Aviation Oil Holding Company raised about $120 million by selling shares in the Singapore-listed unit to investors including hedge funds, in a bid to raise capital to pay for the unit's margin calls, the newspaper cited Chen as saying in the document.*** (emphasis added.)

62.    Also on December 3, 2004, *Bloomberg* published an article entitled "China Aviation Doubled Bets to Cover Loss, *WSJ* Says," which stated in part:

China Aviation Oil (Singapore) Corp., the overseas unit of China's main jet-fuel supplier, repeatedly doubled its bet oil prices would fall in an effort to recover mounting losses on derivatives trades, the *Wall Street Journal* reported, citing court documents.

The Singapore-based unit lost $5.8 million in trades in the first quarter and $35.8 million in the second, and decided to "move back positions on the trades in an effort to ride through the upward-trending oil market," Chen Jiulin, CAO's chief executive said in an affidavit submitted to Singapore's High Court Monday. Jiulin was suspended earlier this week.

63.    Also on December 3, 2004, *Bloomberg* published an article entitled "Singapore Police Start Probe of China Aviation Oil," which stated in part:

Singapore's Commercial Affairs Department, the city's white-collar crime unit, started an investigation of China Aviation Oil (Singapore) Corp. after the company announced $550 million of losses to cover margin calls on derivative contracts, the stock exchange said.

The Singapore Exchange, which started investigations on the company, also said it's working with the central bank on the case.

64.    On December 6, 2004, *Bloomberg* published an article, entitled "China Aviation's Jiulin Mixed Philosophy, Business, *WSJ* Reports," which stated in part:

Chen Jiulin, suspended last week as chief executive of China Aviation Oil (Singapore) Corp., transformed the overseas unit of China's main jet-fuel supplier

- 31 -

with a mixture of Eastern philosophy and mysticism, the *Wall Street Journal* reported.

Though Jiulin turned China Aviation into one of the sought-after stocks on the Singapore exchange, he didn't always practice what he preached, the *Journal* said.

In a column published last year, Chen warned that the international oil market was volatile and dangerous, risk-control methods were essential, and keeping shareholders informed was one of the "five elements of China's corporate governance philosophy."

65.    Also on December 6, 2004, an *Associated Press* article entitled "China Aviation's Ex-

Chief to Face Probe," stated the following:

The suspended head of a major supplier of jet fuel to China, under investigation for overseeing hundreds of millions of dollars in derivatives trading losses, has agreed to return to Singapore to face investigators, the company said Monday.

China Aviation Oil (Singapore) Corp. CEO Chen Jiulin left for China around the time the company acknowledged racking up huge losses after speculative bets on energy markets turned sour.  The Singapore Exchange, where the company is listed, had asked China Aviation Oil to persuade Chen to return to Singapore.

"Mr. Chen has informed the company that he will return to Singapore sometime this week," the company said, adding that he went to China on Nov. 30 "to attend to family matters."

He has apologized to investors, according to a local media report.

China Aviation Oil has said it is continuing to do business despite a criminal investigation of its $550 million in losses on derivative trading.  The Singapore Exchange and central bank said Friday that the company was under investigation by the Commercial Affairs Department, which investigates white-collar crime.

The Singapore-based company stunned investors and markets regulators last week, when it announced the huge losses after speculative bets on energy markets turned sour.

Derivatives dealings allow companies to hedge against risks from price fluctuations by agreeing in advance to buy or sell goods at some future date.  They can bring huge gains, but they also carry great risks.

China Aviation Oil announced the losses late Tuesday and said it was seeking court protection from creditors.  Trading of its shares had been suspended Nov. 29.

The company is controlled by state-owned China Aviation Oil Holding Co.

Court documents in Singapore said the Chinese parent company was aware of the financial problems when on Oct. 20 it sold a 15 percent stake in the troubled supplier for US$108 million (euro81.3 million). According to an affidavit signed by Chen, his company notified its parent group of its troubles on Oct. 10.

66.    On December 7, 2004, *Bloomberg* reported that "Four China Aviation Officials

Surrender Passports." The article stated in part:

China Aviation Oil (Singapore) Corp. said four executives surrendered their passports to Singapore authorities investigation a $550 million derivatives loss by the oil-trading company, supplier of a third of China's jet fuel.

The passports were given to the Commercial Affairs Department, said China Aviation spokesman Gerald Woon. He declined to identify the executives. Authorities last week requested former Chief Executive Chen Zuilin, 43, to return to Singapore from Beijing.

Singapore's police, central bank and exchange are investigating the city's biggest derivatives-trading loss since trader Nick Leeson ran up more than $1.4 billion of losses at Barrings Plc in 1995. Former Prime Minister Goh Chok Tong said on Dec. 4 the city's reputation as a financial center will rest on how well it handles the investigation.

"We are pleased to note that the matter is being investigated, and the Commercial Affairs division is already on it," said David Gerald, president of Securities Investors Association Singapore. "Retail investors who got their fingers burnt look anxiously for redress."

Chen left for Beijing on Nov. 30, the day China Aviation revealed the losses to investors in the stock, which has slumped almost two fifths since the company's Beijing-based parent sold a 15 percent stake in the unit in October.

Two of the executives who handed over their passports to the police are Gerard Rigby, deputy head of trading for jet fuel procurement, and Abdallah Kharma, deputy head of international trading, oil-pricing service Platts reported yesterday.

'Voluntarily Submitted'

Platts said the passports had been "impounded," citing an unidentified person close to the investigation.

"It is incorrect to say that our key officials' passports have been impounded," China Aviation Oil said today in a statement to the Singapore Exchange. The passports were "voluntarily submitted" to police, the company said.

Rigby didn't answer telephone calls seeking comment. Kharma declined to comment. The Commercial Affairs Department also declined to comment.

Singapore's reputation as a financial center will rest on how well it handles the investigation, Vivian Balakrishnan, senior minister of state for trade and industry, said today, echoing comments made on the weekend by Goh, who is now chairman of the Monetary Authority of Singapore, the country's central bank.

The island-state has been attracting more foreign share sales to bolster its efforts to remain a financial center in Asia. Financial services make up more than a 10th of Singapore's $91 billion economy.

The authorities will conduct "a complete investigation as expeditiously as possible," Balakrishnan told reporters. "Our reputation will depend on how we respond."

Share Sale

The probe is also examining the parent's S$196 million ($120 million) sale of a stake in the company in October. At the time, investors were told the sale was to raise funds for an acquisition by the parent, China Aviation Oil Holding Co.

In an affidavit filed in Singapore's High Court on Nov. 29, Chen alleged the funds were to be used to meet margin calls, or funding requirements, on derivative contracts held by the unit.

Deutsche Bank AG, Germany's biggest bank, questioned China Aviation about its finances before arranging the share sale, Mike West, a Deutsche Bank spokesman in Asia, said yesterday.

"The answers provided gave us confidence to proceed with the placement," West said. "The whole process was conducted entirely in accordance with normal market practice and with the appropriate regulatory environment."

The Singapore Exchange ordered China Aviation Oil to appoint PricewaterhouseCoopers to investigate the derivatives trading losses. The accounting firm needs a month to produce a report to the exchange, Subramaniam Iyer, a partner with Pricewaterhouse's advisory practice, said in a telephone interview in Singapore today.

Unknown

"Quite a bit is known, quite a bit is unknown," Iyer said. "We are less than seven days into the investigation."

Pricewaterhouse's investigation will focus on the derivatives trading losses and internal controls at China Aviation Oil, Iyer said.

"We are looking into what went wrong," he said.

China Aviation yesterday said Chief Executive Chen will return to Singapore from China this week.  Chen, who has declined to comment on the probe, didn't answer calls made to his mobile phone.

"We are also happy that the chief executive is coming bank to assist," in investigations, said Gerard from the Singapore investor group.

China Aviation appointed Deloitte & Touche as its financial adviser on repaying creditors.

67.      On December 20, 2004, *Associated Press* published an article, entitled "Shareholders

Urge CEO to Return Wages," which stated in part:

Singapore's largest investors' association said the suspended CEO of China Aviation Oil (Singapore) should return his wages – previously among the highest in the country – as members met to discuss how to recover losses of over half a billion U.S. dollars from risky oil gambles.

"Since you've taken responsibility for the losses, can we suggest you return the 4.6 million Singapore dollars ($2.8 million) in wages?"  Securities Investors Association of Singapore, or SIAS, president David Gerald said to cheers from around 600 minority shareholders.

Gerald was referring to Chen Jiulin, the former CEO of China Aviation Oil (Singapore) Corp., who was arrested last Wednesday and questioned by police after the company reported it lost $550 million by betting on the future price of oil.  Chen is being investigated for unspecified violations of Singapore's Securities and Commissions Act, but hasn't been charged.  He was released on bail.

The SIAS, which claims to represent 63,000 shareholders in the city-state, said it estimates that around 7,000 small stakeholders had lost money from investing in China Aviation Oil (Singapore).

Gerald said he was reassured in a meeting with CAO's parent, China Aviation Oil Holdings Co., Saturday that it would do its best to revive the company.

Gerald was speaking to an auditorium full of minority shareholders, some visibly upset.

"I bought because it was said to be transparent.  What is the criteria given for transparency?" questioned Chan Seck Yang, in reference to SIAS' awarding of the most transparent company in Singapore to CAO in 2002.

The firm's parent company is owned by the Chinese government.

Also Monday, the local *Straits Times* newspaper reported Prime Minister Lee Hsien Loong as saying the city-state should not rush to tighten corporate regulations in the wake of huge trading losses.

The paper quoted Lee as saying that any decisions on the matter should wait until regulators finish investigations into losses at the company, the main supplier of jet fuel to China.

"I would not, as a knee-jerk response every time something goes wrong ... say tighten the rules," the newspaper quoted Lee.

China Aviation Oil sought court protection from its creditors and is working on a restructuring plan.

**CHINA AVIATION'S FALSE FINANCIAL
REPORTING DURING THE CLASS PERIOD**

68.    In order to inflate the price of China Aviation's stock and raise in excess of $100 million to fund the Company's coffers, defendants caused the Company to falsely report its results for 2003 and 2004 by failing to account for the Company's massive liabilities associated with its options and derivatives trading.  These results were also included in press releases disseminated to the public in English over the Company's website.

69.    China Aviation will have to admit that it inappropriately recorded transactions included in its 2003 to 2004 results, and will have to restate those results to properly account for the speculative options trading.  A preliminary report by PriceWaterhouse Coopers indicates China Aviation reported a profit of S$49.6 million for the first nine months of 2004, instead of a loss of S$379 million and failed to account properly for its options trading.  As a result, China Aviation's 2003 to 2004 financial statements were not a fair presentation of China Aviation's results and were presented in violation of applicable accounting principles.

**FIRST CLAIM FOR RELIEF**

**For Violations of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

70.    Plaintiff incorporates ¶¶ 1-69 by reference.

71.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     Employed devices, schemes, and artifices to defraud;

        (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of China Aviation publicly traded securities during the Class Period.

73.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for China Aviation publicly traded securities. Plaintiff and the Class would not have purchased China Aviation publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.  When the truth concerning China Aviation was revealed, trading in the stock was suspended and the Company filed for bankruptcy.  Plaintiff and the class are unable to recover the fraudulent inflation they paid for at the time of purchase and have suffered a loss as a direct result of this fraud.

74.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of China Aviation publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### Pursuant To § 20(a) of the 1934 Act Against All Defendants

75.     Plaintiff incorporates ¶¶1-74 by reference.

76.     The Individual Defendants acted as controlling persons of China Aviation within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of China Aviation, and their ownership of China Aviation stock, the Individual Defendants had the power and authority to cause China Aviation to engage in the wrongful conduct complained of herein and did exercise such control.  By reason of such conduct, the Individual Defendants and China Aviation are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased China Aviation publicly traded securities (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  China Aviation had more than 967 million shares of stock outstanding, owned by hundreds if not thousands of persons in the United States and around the world.

79.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the prices of China Aviation's publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

80.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

81.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to FRCP 23;

B.      Awarding plaintiff and the members of the Class damages, attorney's fees, interest and costs; and

C.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  June 2, 2005                    MURRAY, FRANK & SAILER LLP
                                        BRIAN P. MURRAY (BM-9954)
                                        ERIC J. BELFI (EB-8895)
                                        LAWRENCE D. McCABE (LM 1846)


                                        _____/s/_____
                                              BRIAN P. MURRAY

                                        275 Madison Avenue, Suite 801
                                        New York, NY  10016
                                        Telephone:  212/682-1818
                                        212/682-1892 (fax)

                                        LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        WILLIAM S. LERACH
                                        DARREN J. ROBBINS
                                        401 B Street, Suite 1600
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        SAMUEL H. RUDMAN (SR-7957)
                                        DAVID A. ROSENFELD (DR-7564)
                                        200 Broadhollow Road, Suite 406
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        LAW OFFICE OF CHRISTOPHER J. GRAY, P.C.
                                        CHRISTOPHER J. GRAY
                                        460 Park Avenue, Suite 2100
                                        New York, NY 10022
                                        Telephone:  212/838-3221
                                        212/508-3695 (fax)

                                        Attorneys for Plaintiff

C:\Documents and Settings\lmccabe\Local Settings\Temporary Internet Files\OLK9F\Complaint.doc

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, was served by regular United States mail, postage prepaid, this 2nd day of June, 2005, to the following:

**Plaintiffs' Counsel**

Evan J. Smith, Esq.
**Brodsky & Smith, L.L.C.**
240 Mineola Boulevard
First Floor
Mineola, NY 11501

Marc A. Topaz, Esq.
**Schiffrin & Barroway, LLP**
280 King of Prussia Road
Radnor, PA  19087

**Defendants' List**

**China Aviation**
8 Temasek Boulevard #31-02
Suntec Tower Three
Singapore, 038988

Jia Changbin
**c/o China Aviation**
8 Temasek Boulevard #31-02
Suntec Tower Three
Singapore, 038988

Chen Jiulin
**c/o China Aviation**
8 Temasek Boulevard #31-02
Suntec Tower Three
Singapore, 038988

_____/s/_____
Sigal Fatir